# IN THE COURT OF APPEALS OF IOWA

No. 21-0693
Filed May 11, 2022


IN RE THE MARRIAGE OF BEKELE TUKE ADAM
AND HABIBA HUSSEIN ADAM

Upon the Petition of
BEKELE TUKE ADAM,
  Petitioner-Appellant,

And Concerning
HABIBA HUSSEIN ADAM,
  Respondent-Appellee.
_____


  Appeal from the Iowa District Court for Johnson County, Lars G. Anderson,

Judge.


  A former husband appeals the district court decision granting a dissolution

rather than an annulment of his marriage. **AFFIRMED.**


  Joseph C. Pavelich of Spies & Pavelich, Iowa City, for appellant.

  Charles L. Pierce of Iowa Legal Aid, Iowa City, for appellee.


  Heard by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**TABOR, Judge.**

Bekele Adam and Habiba Kedir chose to end their marriage. Bekele preferred an annulment, but the district court rejected that bid and granted a dissolution. Bekele appeals contending two statutory grounds exist for an annulment: (1) the marriage was prohibited by law and (2) one of the parties was impotent at the time of the marriage. *See* Iowa Code § 598.29 (2018). Because Bekele failed to prove either ground, we affirm the dissolution.

## I. Facts and Prior Proceedings

Both Bekele and Habiba are from Ethiopia and immigrated to the United States, he as a refugee and she on a fiancée visa. But the record regarding their marriage histories is imprecise. Bekele testified he married his first wife in Ethiopia in 1986, then gave wavering testimony about the validity of that marriage. That wife disappeared from Ethiopia shortly after their purported marriage.

Bekele met Habiba in 2000—he was forty-three and she was sixteen. She testified that she was a student at the school where Bekele was a teacher. Shortly after they met, Bekele asked Habiba's family if he could marry her. Bekele and Habiba had a ceremony that same year, though they disagree about what it symbolized. He claimed his family attended an engagement ceremony. But she testified it was a wedding. To counter, Bekele introduced several letters from municipal authorities in Ethiopia stating they could not locate any marriage certificate between the parties.

Still, after this 2000 ceremony, Habiba moved into the house of Bekele's family. Two years later, Habiba and Bekele had a son, A.A., who is now an adult. That same year, Bekele moved to Kenya for political reasons, leaving Habiba and

A.A. in Ethiopia. Bekele would occasionally communicate with Habiba by phone or letter. While in Kenya, he discovered that his first wife was living in the United States. With her sponsorship, he moved to the United States in 2004. In 2006, Bekele's first wife obtained a divorce by default decree in Colorado.

Having settled in Iowa City, in 2008, Bekele began sending remittances to Ethiopia to support Habiba and A.A., a practice he continued for eight years. In 2012, Bekele became a U.S. citizen.

The next year, Bekele returned to Ethiopia and brought their then eleven-year-old son, A.A., back to the United States. Habiba supported the move, explaining: "Even though, as a mother, I felt bad when he departed, I was happy that he came to the United States to get a good education."

Around that same time, Bekele and Habiba agreed that Bekele would apply for a visa listing Habiba as his fiancée so that she could join him and their son in the United States. On his own, Bekele twice filed applications, which were denied. For the third application, Bekele hired an immigration attorney, and the application was approved. As part of the process, Bekele and Habiba agreed to wed within ninety days of her arrival in the country. Bekele paid the application fees, attorney expenses, and Habiba's travel costs.[1]

With the visa approved, Habiba came to the United States in January 2017. Dutifully, the parties were married on February 1, 2017, according to the certificate recorded in Johnson County, Iowa. After the wedding, they filed paperwork to

---

[1] Meanwhile, Bekele went back to Ethiopia in 2015, at which time there was another wedding according to Habiba. She produced a civil marriage certificate dated July 12, 2015, which Bekele claims is fraudulent.

allow Habiba to work in the United States, which received approval in early October. Habiba began working as a housekeeper at a local hotel, a job she enjoyed.

But married life proved distressing. According to Habiba, Bekele was physically and emotionally abusive, sometimes holding her immigration status over her head. She testified that Bekele strangled her, slapped her, and called her a "bitch." Bekele denied the abuse. At one point, Habiba's employer called Bekele to ask for a copy of her work authorization paper. Bekele denied that such paperwork existed, and Habiba lost her job. Soon after that incident, Habiba moved out of their house. From November 2017 forward, she spent seven months living in a domestic violence shelter. In March 2018, while still living in the shelter, she petitioned for relief from domestic abuse; the court granted the protective order. Family members in Ethiopia coordinated with a cousin in Minneapolis who was dispatched to pick up Habiba. She has lived in Minnesota since then.

Also in March 2018 Bekele petitioned for annulment, claiming that Habiba refused to consummate the marriage in 2017 and had only married him for immigration purposes. Habiba resisted annulment, arguing they were married in 2000 and consummated the marriage then. She also asked for the court to convert the case to a dissolution of marriage. She sought no property or spousal support.[2] The district court held a trial on those matters in January 2021.

At the trial, both parties agreed they did not have sex after the 2017 wedding. Bekele testified Habiba refused to have sex with him, saying that she

---

[2] Bekele was then sixty-three, and Habiba was thirty-seven. Their son was no longer a minor.

was "cursed" or was going to be "cursed." Bekele added that he did not believe that she actually had a curse. Habiba denied telling Bekele that she was cursed. Instead, she testified that when they tried to have sex he experienced premature ejaculation and erectile dysfunction, for which he said he would seek treatment, asking her to "be patient" with him. But he never sought treatment.

The court found Bekele did not establish that the 2017 marriage should be annulled for either illegality or impotency.[3] As to illegality, the court found the evidence did not show the marriage between these parties was prohibited by law. No Iowa cases cited an immigration violation as reason for annulment. But even if an immigration violation fit the statutory language, the court found that Bekele did not "establish that Habiba was motivated to marry him solely for immigration purposes." In reaching that result, the court made strong credibility findings that Habiba was the more believable witness.

As to impotency, the court found "the fact that the parties did not have sex after they married does not equate to impotency under the statute." And Bekele did not prove by a preponderance of the evidence that their failure to have sex was a result of the impotence of either party. The court denied Bekele's post-ruling motion to reconsider the credibility findings.

Bekele appeals, insisting again that the marriage should be annulled.

---

[3] The court did not address whether the parties were married before 2017. In any event, because Bekele's earlier marriage was dissolved in 2006, there was no question that he was free to marry Habiba in 2017.

**II. Scope and Standards of Review**

We review annulment and dissolution matters de novo. Iowa R. App. P. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018); *Jensen v. Jensen*, 147 N.W.2d 612, 615 (Iowa 1967). We give weight to the district court's fact findings, particularly on witness credibility, but they do not bind us. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

We review statutory interpretation for legal error. *McHugh v. Smith*, 966 N.W.2d 285, 287 (Iowa Ct. App. 2021). "The purpose of statutory interpretation is to determine legislative intent." *Babka v. Iowa Dep't of Inspections & Appeals*, 967 N.W.2d 344, 355 (Iowa Ct. App. 2021). "We give words their ordinary and common meaning by considering the context within which they are used, absent a statutory definition or an established meaning in the law." *Doe v. Iowa Dep't of Human Servs.*, 786 N.W.2d 853, 858 (Iowa 2010). If a term is "undefined in the statute" and lacks an "established legal meaning," then it should be given its "common, ordinary meaning in the context within which [it is] used." *De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 168 (Iowa 2016). We read the statute as a whole to reach "a sensible and logical construction." *Babka*, 967 N.W.2d at 355 (citation omitted).

**III. Analysis**

Bekele bears the burden of showing his marriage to Habiba should be annulled. Annulments are a creature of statute. "When the validity of a marriage is doubted, either party may file a petition, and the court shall decree it annulled or

affirmed according to the proof." Iowa Code § 598.30. Iowa Code section 598.29 sets out grounds:

> Marriage may be annulled for the following causes:
> 1. Where the marriage between the parties is prohibited by law.
> 2. Where either party was impotent at the time of marriage.
> 3. Where either party had a husband or wife living at the time of the marriage, provided they have not, with a knowledge of such fact, lived and cohabited together after the death or marriage dissolution of the former spouse of such party.
> 4. Where either party was a ward under a guardianship and was found by the court to lack the capacity to contract a valid marriage.

Bekele relies on one and two, illegality and impotency.

## A. Prohibited by Law

Bekele first contends Habiba entered the marriage for the sole purpose of obtaining favorable immigration status, which he argues is "prohibited by law."

Under federal law, "Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both." 8 U.S.C. § 1325(c). We have no cases in Iowa holding that a marriage entered into for the purpose of evading immigration laws is invalid, void, or voidable. But Bekele cites cases from three other jurisdictions that at least acknowledge the possibility. *See In re Marriage of Kidane and Araya*, 389 P.3d 212, 220 (Kan. Ct. App. 2017) (finding where "the parties have no intention of making their marriage a permanent institution, nor . . . plan to live together as husband and wife," where the "sole purpose of the marriage is to commit a fraud on immigration authorities" the marriage is void or voidable under annulment statute); *In re Marriage of Rabie*, 115 Cal. Rptr. 594, 597 (Cal. Ct. App. 1974) (granting annulment where husband

"never intended to fulfill any . . . marital duties" to the wife such as cohabiting, remaining faithful, or even remaining married); *Kurys v. Kurys*, 209 A.2d 526, 528 (Conn. Super. 1965) (finding annulment appropriate "if an alien marries a citizen of this country for the only purpose of entering the United States, and without any intention of assuming the duties and responsibilities of the marriage").

Trouble is, in those cases the request for annulment was based on a claim of fraud relating to the immigration purpose and our statute does not include fraud as a ground for annulment.[4] *See Kidane*, 389 P.3d at 217 (quoting Kan. Stat. Ann. § 23-2702 (2016)); *Rabie*, 115 Cal. Rptr. at 597–98; *Kurys*, 209 A.2d at 528. Still, Bekele argues the district court should have decided that "a marriage which was undertaken for the sole purpose of evading immigration rules is an illegal marriage that may be annulled under Iowa's limited statute." He invites us now to "affirm that such a marriage is voidable and may be annulled under Iowa law."

We need not settle that statutory interpretation question because Bekele did not prove that Habiba entered into their marriage for the purpose of evading any provision of immigration law. Far from "evading" immigration law, the credible evidence is that she applied to enter the United States so that she could have a marital relationship with Bekele. Habiba testified that she came to America to live with her husband and reunite with their son. In fact, she believed that they had been married since 2000, long before Bekele revealed any plan to immigrate to

---

[4] We agree with Bekele that Habiba mistakenly relies on *Estate of Wild v. Wild* because it did not recognize fraud as a basis for annulment. Rather, our court found the estate had no standing to seek an annulment, not being "either party" to the marriage. No. 12-1525, 2013 WL 2371190, at *3 (Iowa Ct. App. May 30, 2013) (quoting Iowa Code § 598.29).

the United States. Habiba testified that she agreed to the 2017 marriage because she was following her husband's instructions for her visa application. And she testified that she would have stayed in a marital relationship if Bekele had not abused her.

Bekele counters that she was motivated by immigration matters. He points out that although she believed they were married when she was sixteen, they spent most of the next decade apart. He also emphasizes that she left their marital home in Iowa shortly after receiving her work authorization. She did not seek a protective order until four months after moving out. And she could not produce police reports or photographs to document the abuse. He posits she fabricated the abuse to obtain a favorable immigration status.

His arguments are unconvincing. The evidence shows Bekele made the decision to leave Habiba and his son in Ethiopia and travel first to Kenya and then to the United States. Bekele also conceded that having Habiba join him and their son in the United States was a plan they discussed and agreed on.

The credible evidence also shows Habiba left their home because of Bekele's abuse. She spent seven months living in a domestic violence shelter. A caseworker at the shelter's Domestic Violence Intervention Program testified that she observed meetings between Habiba and Bekele, and Habiba was "clearly shaken" and "clearly afraid" in Bekele's presence, on the verge of crying. Similarly, an employee at a refugee resettlement program in Minneapolis testified Habiba reported abuse by Bekele. That employee offered Habiba a place to live because she brought nothing with her when she fled the marital home. She also left the

home without her son and important paperwork documenting her immigration and work status.

Important to our decision, the district court found Habiba was "very credible in her testimony that immigration was not her sole motivation" for the marriage. The court also found the corroborating witnesses to be credible and their testimony to be "largely support[ive]" of hers. By contrast, the court disbelieved Bekele's explanation that Habiba made up the abuse allegations to help her immigration status. The court noted Habiba did not speak or read English. Habiba confirmed that she could not read or understand the immigration documents, and only signed them because she trusted her husband. And Habiba testified she was unaware of legal options for immigrants who are victims of abuse, such as a "U visa."

Bekele urges us to disregard the court's credibility determinations, pointing to inconsistent statements by Habiba. But we traditionally give deference to the court's credibility determinations because it has "a firsthand opportunity to hear the evidence and view the witnesses." *Christy v. Lenz*, 878 N.W.2d 461, 464 (Iowa Ct. App. 2016) (citation omitted). "[T]he conduct and appearance of the witness on the witness stand" as well as their "carriage, behavior, bearing, manner[,] and appearance" are all relevant factors that the trial judge is in the best position to assess. *Ruden v. Peach*, 904 N.W.2d 410, 413 (Iowa Ct. App. 2017) (citations omitted). Such in-person cues likely increase in value when a translator operates as a filter to our cold transcript. So we follow the traditional path and defer to the district court's conclusions on the relative veracity of the parties. The credible evidence shows that when Habiba entered the 2017 marriage, she both believed

the parties were already married and intended to live with her husband and son as a family.

Bekele did not show his marriage to Habiba was "prohibited by law" under our annulment statute. Even if we assume his statutory interpretation is correct, he did not prove Habiba entered into the marriage for the purpose of evading immigration laws.

## B. Impotence

Failing the illegality ground, Bekele turns to impotence. He argues the court erred in its interpretation of the annulment statute. Under a different interpretation, Bekele contends he proved that one or both parties were "impotent at the time of marriage." Iowa Code § 598.29(2).

Because the statute does not define "impotent," the district court looked to the dictionary definition:

> According to Merriam-Webster, *impotent* is defined as "unable to engage in sexual intercourse because of inability to have and maintain an erection." *Impotent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/impotent. This definition pertains obviously to a male, but the legislature contemplated impotence on the part of females as well by including the phrase "either party" in the statute. Generally, impotent in the context of annulment statutes then means "denoting an inability to have sexual intercourse due to any of several causes." *Incapacity for sexual intercourse as ground for annulment*, 52 A.L.R.3d 589, § 4 (1973) (Originally published in 1973).

The district court then asked, "Must this 'inability' be more or less permanent to equate to statutory impotence?" and answered yes. Citing *Heller v. Heller*, 174 A. 573, 575 (N.J. 1934),[5] and the American Law Review, 52 A.L.R.3rd 589, § 8

---

[5] *Heller* may not be the best authority here because it interprets a statute that explicitly requires the spouse be "incurably impotent." 174 A. at 574–75.

(originally published 1973), the court reasoned that the statute contemplated permanent or incurable impotency because "[a]llowing for annulments in cases of transitory or easily remedied impotence" would make "little sense."

Turning to the record, the court found, "Here, there is no firm evidence of impotence, and, even if it existed, there was no evidence of its incurability." The court considered Bekele's testimony that Habiba claimed to be "cursed" and noted, "the evidence established she could address that curse in Ethiopia."[6] The court also found if Bekele was suffering from "more traditional impotence," there was not enough evidence to establish it was incurable.

Like the district court, we grapple with what the drafters meant by impotent. No cases interpret that provision.[7] When a term is "undefined in the statute" and lacks an "established legal meaning," then we adopt its "common, ordinary meaning in the context within which [it is] used." *De Stefano*, 879 N.W.2d at 168. Also like the district court, we find the dictionary definition to be, at best, a starting point. The dictionary's male-centric definition of impotence, highlighting the inability to maintain an erection, does not fit with the annulment statute's reference

---

[6] Habiba denied telling Bekele she was cursed such that she was impotent. But Bekele testified to various remedies he pursued including talking with religious leaders at their mosque, reading the Quran, and seeking a cure in Ethiopia. He stopped short of sending Habiba to Ethiopia, which led the court to conclude he had not proved the curse was permanent and incurable.

[7] Our courts have discussed impotency as a defense to a crime or to disprove paternity. *See State v. John*, 176 N.W. 280 (Iowa 1920) (finding evidence of impotency due to a severe stroke causing paralysis could be used as a defense to assault with intent to commit rape); *State v. Norris*, 97 N.W. 999 (Iowa 1904) (finding, where impotence was alleged as a defense to rape, sufficiency of the evidence was a jury question); *State v. Lavin*, 46 N.W. 553 (Iowa 1890) (holding the presumption that a child born in wedlock is legitimate may be rebutted with proof the husband was impotent or without access to the mother).

to "either party" being impotent at the time of the marriage. *See* Iowa Code § 598.29(2). When the legislature adopted that language, marriage in Iowa was limited to opposite-sex couples, so the drafters must have believed both men and women could be impotent. In other words, impotence must mean more than being unable to maintain an erect penis. Indeed, the less specific sense of the word impotent is "not potent." *Impotent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/impotent (last visited Apr. 27, 2022). "Potent," more prosaically, means "having or wielding force, authority, or influence," "achieving or bringing about a particular result," "chemically or medicinally effective," "rich in a characteristic constituent," or finally "able to copulate—usually used of the male." *Potent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/potent (last visited Apr. 27, 2022).

Iowa case law does little to assist our quest for a definition. The few cases that discuss impotency are not very enlightening. In an early case, *McCraney v. McCraney*, the supreme court approved the principle that if a husband is divorced from his first wife based on his "perpetual impotence, *quoad hanc*"[8] and goes on to have children with his second wife, those children "shall be legitimate." 5 Iowa 232, 244 (1857). And in *Rouse v. Rouse*, the court declined on procedural grounds to determine whether the wife was entitled to spousal support after the husband discovered she had "some sort of a tumor in the pelvic cavity." 47 Iowa 422, 424 (Iowa 1877). The court did detail the evidence of the tumor as being of a

---

[8] As opposed to "universal impotency," impotency quoad hanc means a person is incapable of having sexual intercourse with another specific person. *See Vanden Berg v. Vanden Berg*, 197 N.Y.S. 641, 642 (N.Y. Sup. Ct. 1923).

"cancerous character, and dangerous to both parties." *Id.* Neither case speaks to the permanency of the condition.

Given the paucity of authority on the subject, Bekele faults the district court for inserting into "this vacuum . . . a standard that the impotence must be more-or-less incurable." He also insists the court erroneously required that he prove impotence with medical evidence beyond his own testimony. At bottom, Bekele contends: "In the case of impotency, the reason for an annulment—for determining the marriage contract to be a nullity—is the likelihood that the parties will not be able to procreate." He argues that such a rationale has little to do with the condition's susceptibility to treatment.

On the issue of curability, several other states have interpreted their statutes as requiring the impotency be incurable even though not explicit in the language of their statutes. In *Dolan v. Dolan*, 259 A.2d 32, 38 (Me. 1969), the court explained:

> Although marriage is a civil contract, immediately upon its consummation public policy endows the marital relationship with enduring rights and responsibilities concerning which the State attaches primary importance and exercises ultimate control. In terms of State interest, the dissolution of the marriage in annulment suits has virtually the same impact upon the public good as the liquidation of the marital status through divorce. Public policy would be in a constant state of frustration if the judiciary attributed to the Legislature in its use of the term impotence as a cause for divorce or nullity of marriage a meaning encompassing any temporary or occasional incapacity for sexual intercourse. We hold with virtually universal authoritative acceptance that impotence within the purview of our statute regulating divorce and annulment denotes a permanent inability on the part of one of the parties to the marriage

contract to perform the complete act of sexual intercourse. The incapacity must be incurable.

259 A.2d at 38 (internal citation omitted). The Missouri Supreme Court reached a similar conclusion in *Kempf v. Kempf*, 34 Mo. 211, 213–14 (Mo. 1863). As did the Kansas Supreme Court in *Bunger v. Bunger*, 117 P. 1017, 1018–19 (Kan. 1911). In *Bunger*, the court also rejected the notion that impotence refers only to an incapacity for procreation. 117 P. at 1018. "[I]n the law of divorce it means want of potentia copulandi, and not merely incapacity for procreation. It is an incapacity that admits neither copulation nor procreation." *Id.*

Persuaded by those rationales, we do not believe that our legislature intended annulment to be an available remedy if the condition of impotence was temporary. Bekele must show Habiba's impotence, if any, was more than transitory—even though that language does not appear in our statute. As the district court noted, this makes sense given the importance we place on marriage and "the vagaries associated with interpersonal sexual relations." As for the necessary proof, we do not read the district court decision as requiring medical evidence.

Turning to the evidence, we find that Bekele failed to show Habiba was impotent at the time of the marriage.[9] But we take a different tack from the district court. The only evidence of a curse is Bekele's recounting of statements that

---

[9] Although the district court discussed the lack of evidence showing either party was impotent, Habiba points out that Bekele never pled his own impotence and never agreed that he had sexual performance problems. We agree that ground was not properly pled. We also find Bekele, as the party requesting an annulment and bearing the burden of proof, cannot rely on Habiba's testimony to establish his own impotence. We decline to consider Bekele's alternative claim that he is the impotent party.

Habiba denies making.  She also testified that she was "able to engage in sexual intercourse," and the couple tried several times but Bekele could not maintain an erection due to erectile dysfunction and premature ejaculation.  Bekele presented no evidence about the persistence of her alleged impotence.  After all, they have a child in common and had sex off and on since 2000.  Given the court's credibility determinations and the shortcomings in Bekele's evidence about Habiba's physical condition, we conclude Bekele did not prove Habiba was impotent.

In sum, Bekele has not carried his burden of showing that Habiba was impotent at the time of their marriage.  Nor did he show their marriage was prohibited by law.  Finding no grounds to annul the marriage and being presented with no other challenges to the dissolution, we affirm the decree.

**AFFIRMED.**